UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

GREGORY DARNELL,

        Plaintiff,

      v.                                        Case No. 20-C-884

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,

        Defendant.

## DECISION AND ORDER AFFIRMING THE COMMISSIONER'S DECISION

      Plaintiff Gregory Darnell filed this action for judicial review of a decision by the Commissioner of Social Security denying his application for disability and disability insurance benefits under Title II of the Social Security Act. Darnell asserts that the decision of the administrative law judge (ALJ) is flawed and requires reversal for a number of reasons. For the reasons that follow, the Commissioner's decision will be affirmed.

## BACKGROUND

      Darnell filed an application for disability and disability insurance benefits on December 4, 2017, alleging disability beginning January 1, 2014, at which time he was 48 years old. He listed carpal tunnel in both hands, tendonitis in both elbows, left knee bone on bone, both shoulders, fibromyalgia, and hand issues as the conditions limiting his ability to work. R. 193. After his application was denied initially and upon reconsideration, he requested a hearing before an ALJ. On March 12, 2019, ALJ William Shenkenberg held a hearing at which Darnell, who was represented by counsel, and a vocational expert (VE) testified. R. 36–66.

At the time of the hearing, Darnell was 53 years old and living in a house with his wife and five of his six children, ages 9, 13, 14, 16, and 18, in Green Bay, Wisconsin. R. 41–42. Two of the children were foster children that he was waiting to get guardianship over. He testified that he completed his junior year of high school but did not graduate. R. 42. He last worked as a bartender for about ten years. R. 43. He testified that he stopped working because the bar was closing and he had pain in his knee from standing. R. 48–49, 57. He did not look for work afterward because he "just chose to do the foster care full-time and be home." R. 57. Darnell used to do yard maintenance, such as mowing, weeding, and raking, for his children's school "every once in a while." R. 43–44.

Darnell stated that he filed for social security because he needs a knee replacement after walking "bone on bone for 20 years." R. 45. He also indicated that his hands lock up and cramp and that he was getting surgery on his right hand for degenerative cartilage failure and a mass cyst. Darnell testified that he has carpal tunnel issues in both wrists. He stated that his right wrist has bothered him since his carpal tunnel surgery ten years ago and that he experiences numbness in his left wrist. Darnell indicated he did not have any procedures planned for the left wrist because he wanted to focus on one wrist at a time. He stated that he also had work on both shoulders. Darnell stated that, about 25 years ago, he fell off a ladder at a job site and needed his right rotator repaired. R. 45–46. He reported that he takes muscle relaxers as needed, stretches, and uses heat and ice to treat his shoulders. R. 46. He also takes Ibuprofen for the pain, Meloxicam for arthritis, and Citalopram and Alprazolam for anxiety. R. 49. Darnell indicated that he frequently feels depressed and estimated that he had been struggling with mental health issues for almost five years. *Id.* He explained that he only has problems getting along with other people when he is in pain and that he has trouble concentrating. R. 50.

2

As a stay-at-home parent, he runs a lot of errands, including taking the children to and from three different schools and to doctors' appointments. R. 44, 52. Darnell described that, in addition to driving his children around, he makes dinner, with help, and does little else each day. R. 51–52. He also explained that he forces himself to do as much as he does because of his children. R. 52. When asked specifically about his schedule involving his children, he testified that he tries to attend most of his children's sporting events but that it is hard sitting on the benches. R. 54. Darnell indicated that, at the time he filed for disability, he could stand or sit for maybe a total of three hours in an eight-hour workday. He stated that he thought he had really been disabled for about ten years, since his last knee surgery, even though he continued to work. R. 48.

In a thirteen-page decision dated June 24, 2019, the ALJ concluded that Darnell was not disabled under the Social Security Act from his alleged onset date of January 1, 2014, through his date last insured. R. 19–31. In reaching his decision, the ALJ followed the five-step sequential process established by the Social Security Administration (SSA) for determining disability. The ALJ determined that Darnell last met the insured status requirements of the Social Security Act on December 1, 2017, and had not engaged in substantial gainful activity from January 1, 2014, his alleged onset date, through his date last insured. R. 21. The ALJ found that Darnell had the following severe impairments: left knee degenerative joint disease with a history or arthroscopic surgery in 2008, fibromyalgia, carpal tunnel syndrome, a history of bilateral shoulder surgeries, and obesity. *Id.* The ALJ determined that Darnell did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 23.

The ALJ then assessed Darnell's residual functional capacity (RFC), finding that, through his date last insured, Darnell could "perform light work as defined in 20 C.F.R. 404.1567(b)"

3

except that he was limited to "occasional climbing of ramps, stairs, ladders, ropes, and scaffolds; occasional kneeling, crouching, and crawling; frequent balancing and stooping; frequent overhead reaching bilaterally; and frequent handling and fingering bilaterally." R. 24. He found that Darnell was capable of performing his past relevant work as a bartender as generally performed in the economy but not as he actually performed it. R. 29. The ALJ found that, considering his age, education, work experience, and RFC, Darnell was capable of performing other jobs existing in significant numbers in the national economy, including cashier, cleaner, and photocopy operator. R. 29–30. Based on these findings, the ALJ concluded Darnell was not disabled from January 1, 2014, through December 31, 2017. R. 30. The Appeals Council denied Darnell's request for review of the ALJ's decision, making that decision the final decision of the Commissioner. R. 7.

## LEGAL STANDARD

The burden of proof in social security disability cases is on the claimant. 20 C.F.R. § 404.1512(a) ("In general, you have to prove to us that you are blind or disabled."). While a limited burden of demonstrating that other jobs exist in significant numbers in the national economy that the claimant can perform shifts to the SSA at the fifth step in the sequential process, the overall burden remains with the claimant. 20 C.F.R. § 404.1512(f). This only makes sense, given the fact that the vast majority of people under retirement age are capable of performing the essential functions required for some subset of the myriad of jobs that exist in the national economy. It also makes sense because, for many physical and mental impairments, objective evidence cannot distinguish those that render a person incapable of full-time work from those that make such employment merely more difficult. Finally, placing the burden of proof on the claimant makes sense because many people may be inclined to seek the benefits that come with a finding of disability when better paying and somewhat attractive employment is not readily available.

4

The determination of whether a claimant has met this burden is entrusted to the Commissioner of Social Security. Judicial review of the decisions of the Commissioner, like judicial review of all administrative agencies, is intended to be deferential. *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010). The Social Security Act specifies that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). But the "substantial evidence" test is not intended to reverse the burden of proof. In other words, a finding that the claimant is not disabled can also follow from a lack of convincing evidence.

Nor does the test require that the Commissioner cite conclusive evidence excluding any possibility that the claimant is unable to work. Such evidence, in the vast majority of cases that go to hearing, is seldom, if ever, available. Instead, the substantial evidence test is intended to ensure that the Commissioner's decision has a reasonable evidentiary basis. *Sanders v. Colvin*, 600 F. App'x 469, 470 (7th Cir. 2015) ("The substantial-evidence standard, however, asks whether the administrative decision is rationally supported, not whether it is correct (in the sense that federal judges would have reached the same conclusions on the same record).").

The Supreme Court has reaffirmed that, "[u]nder the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "The phrase 'substantial evidence,'" the Court explained, "is a 'term of art' used throughout administrative law to describe how courts are to review agency factfinding." *Id.* "And whatever the meaning of 'substantial' in other contexts," the Court noted, "the threshold for such evidentiary sufficiency is not high." *Id.* Substantial evidence is "'more than a mere scintilla.'" *Id.* (quoting *Consolidated Edison*, 305 U.S.

5

at 229). It means—and means only—"'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.*

The ALJ must provide a "logical bridge" between the evidence and his or her conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). "Although an ALJ need not discuss every piece of evidence in the record, the ALJ may not ignore an entire line of evidence that is contrary to the ruling." *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009) (citing *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009); *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004)). But it is not the job of a reviewing court to "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] judgment for that of the Commissioner." *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). Given this standard, and because a reviewing court may not substitute its judgment for that of the ALJ, "challenges to the sufficiency of the evidence rarely succeed." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005).

Additionally, the ALJ is expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

**ANALYSIS**

**A. Assessment of Opinion Evidence**

Darnell contends that the ALJ erred in evaluating the medical opinions of Dr. Thomas Florack and the Functional Capacity Evaluation completed by occupational therapist Christopher Smith. Under the new regulations, an ALJ is not required to give any specific evidentiary weight

6

to any medical opinion. 20 C.F.R. § 404.1520c(a). Instead, the ALJ must focus on the persuasiveness of the medical opinions by considering the following factors: supportability, consistency, the relationship with the claimant, specialization, and other factors. § 404.1520c(c). Supportability and consistency are the "most important factors" to consider. § 404.1520c(b)(2).

On March 15, 2018, Dr. Florack completed a "Return to Work Recommendations Record." R. 519. He noted that Darnell was diagnosed with "left knee chronic ACL insufficiency/post traumatic arthritis." *Id.* He observed that Darnell's condition was not work related and that he could return to work anytime with certain restrictions. In particular, Dr. Florack opined that Darnell could stand for three to five hours a day, walk for three to five hours a day, stand and walk for 30-minute intervals and never squat or climb ladders and scaffolds. He indicated that the restrictions are permanent and that, if an employer cannot accommodate these restrictions, Darnell is "incapacitated." *Id.*

The ALJ found Dr. Florack's opinion unpersuasive. R. 28. He noted that the opinion was given after the expiration of the date last insured, December 31, 2017, and did not indicate when the limitations began. He also found that the opinion is inconsistent with the medical evidence of record during the period under adjudication, which shows conservative treatment and minimal clinical findings. *Id.* (citing Exs. 4F/23, 28 & 5F/1). The ALJ also explained that, in stating Darrell is incapacitated if the restrictions are not accommodated, Dr. Florack commented on an issue reserved to the Commissioner. *Id.*

Darnell asserts that the ALJ erred in finding that Dr. Florack's opinion that Darnell would be incapacitated if the restrictions were not addressed is not an opinion on the ultimate issue of disability. The regulations reserve to the Commissioner "the *final* responsibility for deciding residual functional capacity (ability to work—and so whether the applicant is disabled)." *Bjornson*

7

*v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) (citation omitted). In this case, the ALJ correctly concluded that Dr. Florack's opinion was a determination reserved to the Commissioner. Although the ALJ cannot entirely disregard an opinion that intrudes on an issue reserved to the Commissioner, the ALJ adequately explained why he found Dr. Florack's opinion unpersuasive.

Darnell asserts that the ALJ erred in finding the opinion unpersuasive simply because it was issued after the date last insured. He contends that Dr. Florack's opinion was a valid retrospective diagnosis of his condition before his date last insured. "A physician's retrospective diagnosis is a medical opinion of the claimant's impairments which relates back to the covered period." *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). "A retrospective diagnosis may be considered only if it is corroborated by evidence contemporaneous with the eligible period." *Id.* at 640. Dr. Florack's opinion, which was offered several months after the date last insured, does not indicate when Darnell's limitations began or that the limitations relate back to the adjudication period. As such, the ALJ was not required to find that it was a retrospective diagnosis.

Darnell argues that the ALJ failed to properly consider the regulatory factors in determining whether Dr. Florack's opinion was persuasive. Under the new framework, however, the most important factors to consider in weighing a medical source's opinion are supportability and consistency. The ALJ noted that the opinion was inconsistent with the medical evidence, which showed conservative treatment and minimal clinical findings. Darnell asserts that the ALJ erred in relying on his conservative treatment without indicating what other treatment was available and appropriate. But the ALJ properly noted that Darnell's treatment during the adjudication period consisted of routine exams and that he had normal clinical findings. *See Simila v. Astrue*, 573 F.3d 503, 519 (7th Cir. 2009) (ALJ is entitled to rely on claimant's relatively conservative treatment

history).  The ALJ adequately explained why he found Dr. Florack's opinion unpersuasive, consistent with 20 C.F.R. § 404.1520c.

Occupational therapist Chris Smith completed a Functional Capacity Evaluation (FCE) on June 26 and 27, 2018.  R. 535–43.  He summarized Darnell's self-reported symptoms and treatment.  R. 536.  Smith noted that, while Darnell "offered frequent complaint of knee pain and hand pain," he "worked to maximal levels" during the evaluation.  *Id.*  He observed that Darnell "demonstrated generally smooth and coordinated movement through the testing procedure" but favored his left leg.  *Id.*  Smith found that Darnell's muscle strength, range of motion, bilateral grip strength, and hand coordination scores were "within norms" and that he could sit "without functional difficulty."  *Id.*  He noted decreases in overall lifting and carrying abilities, position tolerances, and "lower extremity strength for standing, walking, floor to waist lifting, stair climbing, and ladder climbing."  *Id.*  He observed that Darnell's "abilities are currently most consistent with the demands of LIGHT-MEDIUM work defined as work requiring lifting and carrying 30 lbs. maximum.  Client is able to carry 35 lbs. maximum."  R. 537.  Smith also limited Darnell to occasional bending, standing, kneeling, climbing stairs, and walking, with no crouching.

The ALJ stated that he did not find the opinions set forth in the FCE to be persuasive.  R. 28.  He reasoned that the opinions are based on an evaluation conducted after the date last insured.  He also noted that, with regard to the limitations on standing and walking, the opinions are not consistent with the longitudinal evidence of record, which he determined show "generally normal strength and range of motion, with limited complaints, imaging or treatment."  R. 28–29.

While acknowledging that the FCE was completed after his date last insured, Darnell contends that it was a retrospective diagnosis that was relevant to his disability determination.  Smith did not indicate that the FCE reflected Darnell's abilities prior to the date last insured, and

9

it is not "corroborated by evidence contemporaneous with the eligible period." *Estok*, 152 F.3d at 640. Indeed, Smith identified the evaluation as relating to Darnell's current abilities at the time it was conducted. *See* R. 537 ("abilities are currently . . . ."). In short, it was not improper for the ALJ to find that Smith's opinion was not persuasive because the evaluation occurred after the date last insured. The ALJ properly applied the regulatory framework in assessing Smith's opinions.

The ALJ also discussed the findings of the state agency consultants. R. 28. The state agency consultants, Dr. Pat Chan and Dr. LaVerne Barnes, determined that there was insufficient evidence from which to assess Darnell's physical health from the alleged onset date to the date last insured. R. 70–72; 79–81. The ALJ found that these opinions were "somewhat persuasive" because they were consistent with the medical evidence of record showing no significant functional limitations. R. 28. Darnell does not challenge the ALJ's consideration of these administrative findings. Despite the state agency consultant's conclusion that there was insufficient evidence from which to assess Darnell's physical health, the ALJ determined that the evidence in the record was sufficient to establish some physical impairments as severe and created an RFC that adopted limitations that accommodate Darnell's subjective complaints. *Id.* The ALJ gave logical reasons for his assessment of the medical opinion evidence in the record, and his evaluation was not unreasonable.

## B. Limitation to Light Exertional Work

Darnell argues that the ALJ erred in assessing his RFC because he did not rely on any medical opinion or evidence to support his decision to limit Darnell to light exertional work. "The RFC represents the maximum a person can do—despite his limitations—on a regular and continuing basis, which means roughly eight hours a day for five days a week." *Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013) (citations omitted). An RFC assessment "is a matter for the ALJ

alone—not a treating or examining doctor—to decide." *Thomas v. Colvin*, 745 F.3d 802, 808 (7th Cir. 2014). The ALJ must consider the "entire record" and "is not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians." *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007). In assessing a claimant's RFC, the ALJ has the responsibility of resolving any conflicts between the medical and nonmedical evidence. *Pepper*, 712 F.3d at 363. The Court's task "is to determine whether substantial evidence supports the ALJ's RFC conclusion." *Id.*

In this case, the ALJ thoroughly discussed the evidence in the record, including the medical record, medical opinions, Darnell's testimony and subjective reports of his symptoms, and his activities of daily living. R. 24–26. The ALJ addressed Darnell's fibromyalgia, carpal tunnel syndrome, rotator cuff repairs, obesity, knee, and other issues. As to Darnell's left knee degenerative joint disease, the ALJ found that the medical records fail to substantiate fully Darnell's allegations of disabling symptoms and limitations caused by the left knee degenerative joint disease because the treatment during the period under adjudication was limited to pain medication and the clinical findings were largely normal. He cited notes from June 2014, where Darnell had normal strength, reflexes, and sensation, and from June 2015, where the joints were without effusion, warmth, or tenderness, and Darnell had normal reflexes, strength, and sensation. R. 26 (citing Ex. 5F/1; 4F/23, 28).

The ALJ noted that, with respect to fibromyalgia, the medical records also fail to substantiate fully Darnell's allegations of disabling symptoms and limitations because clinical findings were noted at only a few appointments. *Id.* (citing Ex. 4F/19, 23). He also explained that the medical records fail to substantiate fully Darnell's allegations of disabling symptoms and limitations caused by a history of carpal tunnel syndrome because Darnell did not receive any

11

treatment for this issue during the period under adjudication and clinical findings were largely normal. R. 26–27 (citing Ex. 4F/23, 28).

The ALJ stated that, as for the history of bilateral shoulder surgeries, the medical records did not fully substantiate Darnell's allegations of disabling symptoms and limitations. He noted that the diagnostic findings were normal and cited a September 2015 x-ray of the right shoulder that showed normal osseous mineralization and no apparent fracture or dislocation, with the acromioclavicular joint within normal limits. *Id.* (citing Ex. 4F/14). The ALJ indicated that clinical findings were largely normal, and when Darnell experienced right shoulder pain in September 2015, clinical findings were minimal and resolved within three months. In September 2015, there was no erythema or edema, range of motion was within normal limits, and Darnell had full strength. The ALJ observed that Jobe's, Hawkin's, liftoff, belly press, and Hornblower's tests were negative and that Darnell had negative external rotation lag sign. Darnell's complaints were diagnosed as muscular strain. The ALJ noted that Darnell showed improvement after undergoing physical therapy. *Id.* The ALJ found that there was no evidence that Darnell's obesity significantly affected his ability to function, stating that Darnell "retains relatively good physical function despite his body habitus, including normal gait and strength." *Id.* (citing Ex. 4F/23, 28).

The ALJ concluded that the medical evidence documents Darnell's left knee degenerative joint disease with a history of arthroscopic surgery in 2008, fibromyalgia, history of carpal tunnel syndrome, history of bilateral shoulder surgeries, and obesity. To accommodate Darnell's physical condition, the ALJ limited him to "the light exertion level" and to "occasional climbing of ramps, stairs, ladders, ropes, and scaffolds, occasional kneeling, crouching, and crawling, frequent balancing and stooping, and frequent overhead reaching bilaterally, and frequent handling and fingering bilaterally." R. 26. Darnell criticizes the ALJ's conclusion, asserting that there is no

12

medical opinion viewed as persuasive by the ALJ that specifically identifies his ability to do light, as opposed to sedentary or medium work. But an ALJ is not required to rely on any one opinion from a medical provider. *Schmidt*, 496 F.3d at 845. The ALJ explained why he assigned a light exertional level and why a sedentary exertional level was not warranted. He stated:

> A light residual functional capacity with postural limitations is warranted given the diagnoses of left knee degenerative joint disease with a history of arthroscopic surgery in 2008, fibromyalgia, history of carpal tunnel syndrome, history of bilateral shoulder surgeries, and obesity. However, limitation to the sedentary exertion level is not warranted as the medical evidence for the period under adjudication shows normal imaging, conservative treatment, and minimal clinical findings.

R. 28. The ALJ provided an accurate and logical bridge from the evidence to his conclusions, and substantial evidence supports the ALJ's RFC assessment. Accordingly, remand is not warranted on this basis.

## CONCLUSION

For these reasons, the decision of the Commissioner is **AFFIRMED**. The Clerk is directed to enter judgment in favor of the Commissioner.

**SO ORDERED** at Green Bay, Wisconsin this 25th day of March, 2022.

s/ William C. Griesbach
William C. Griesbach
United States District Judge